1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .    Criminal No. 1:18cr333
                              .
     vs.                      .    Alexandria, Virginia
                              .    September 17, 2018
CARLA DONNA McPHUN,           .    2:00 p.m.
                              .
            Defendant.        .
                              .
. . . . . . . . . .  .
```

TRANSCRIPT OF PRE-INDICTMENT PLEA
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            JACK HANLY, AUSA
                               GRACE L. HILL, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314


FOR THE DEFENDANT:             RICHARD A. FINCI, ESQ.
                               Houlon, Berman, Finci &
                               Levenstein, LLC
                               7850 Walker Drive, Suite 160
                               Greenbelt, MD 20770
                                 and
                               JONATHAN R. OATES, ESQ.
                               4103 Chain Bridge Road, Suite 401
                               Fairfax, VA 22030


OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                               U.S. District Court, Third Floor
                               401 Courthouse Square
                               Alexandria, VA 22314
                               (703)299-8595


(Pages 1 - 41)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

(Defendant present.)

1   
2   
3       THE CLERK:  Criminal Case 18-333, United States of
4   America v. Carla Donna McPhun.  Would counsel please note their
5   appearances for the record.
6       MR. HANLY:  Good afternoon, Your Honor.  Jack Hanly
7   and Grace Hill for the United States.
8       THE COURT:  Good afternoon.
9       MR. FINCI:  And good afternoon, Your Honor.  Richard
10  Finci and Jonathan Oates on behalf of Carla McPhun.  Nice to
11  see you again, Your Honor.
12      THE COURT:  All right.
13      MR. OATES:  Good afternoon, Your Honor.
14      THE COURT:  Ms. McPhun, go up to the lectern.  The
15  clerk is going to place you under an affirmation.
16      CARLA DONNA DeSILVA McPHUN, DEFENDANT, AFFIRMED
17      THE COURT:  All right.  Ms. McPhun, you have just
18  taken a promise to tell the truth in answering all of the
19  Court's questions.  That means that if you should lie in
20  answering any question, the government could prosecute you for
21  a new and separate crime called perjury.
22      Do you understand that?
23      THE DEFENDANT:  Yes.
24      THE COURT:  For the record, what is your full name?
25      THE DEFENDANT:  Carla Donna DeSilva McPhun.

3

1          THE COURT:  And, Ms. McPhun, how old are you?

2          THE DEFENDANT:  Fifty.

3          THE COURT:  How much schooling have you completed?

4          THE DEFENDANT:  A bachelor's.

5          THE COURT:  You have a bachelor's degree?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  Do you have any problem reading, writing,

8    understanding, or speaking English?

9          THE DEFENDANT:  No, I don't.

10          THE COURT:  Are you a United States citizen?

11          THE DEFENDANT:  Yes, I am.

12          THE COURT:  Are you presently on probation, parole,

13    or supervised release from any other criminal case?

14          THE DEFENDANT:  No, I'm not.

15          THE COURT:  Are you at this time under the care of a

16    doctor for any physical or mental condition?

17          THE DEFENDANT:  No, I'm not.

18          THE COURT:  You're not being treated?  I thought the

19    pretrial report indicated you have some problems.

20          THE DEFENDANT:  I take medication, but I'm not under

21    the doctor's care.

22          THE COURT:  All right.  What medications are you

23    taking?

24          THE DEFENDANT:  I don't have the names of them.  I

25    don't have --

4

1           THE COURT:  How many prescription medications do you

2    take on a daily basis?

3           THE DEFENDANT:  I don't take any of them on a daily

4    basis.

5           THE COURT:  So they're as needed?

6           THE DEFENDANT:  One is as needed.  That's the heart

7    medication.  The other one is every 14 days, I do a ten-day

8    course.

9           THE COURT:  All right.  Now, right now, are you

10   feeling the results of any of your medical conditions?

11          THE DEFENDANT:  No.  Just in the last couple of days,

12   a little bit of heart fluttering.  That's it.

13          THE COURT:  Well, it said in the Pretrial Services

14   report you have panic attacks.

15          THE DEFENDANT:  Yes.  But that's the fluttering in

16   the heart that I get as a result of stress.

17          THE COURT:  All right.  In any respect, is that

18   condition bothering you right now?

19          THE DEFENDANT:  No, not at this time.

20          THE COURT:  So within the last 24 hours, have you

21   taken any medicine, whether by prescription or over the

22   counter, like an aspirin or an Advil?

23          THE DEFENDANT:  No, I have not.

24          THE COURT:  Are you at this time under the influence

25   of any alcohol or illegal drugs?

5

```
 1              THE DEFENDANT:  No, I am not.

 2              THE COURT:  All right.  Ms. McPhun, in court today,

 3    there are several documents we need to go over.  The first one

 4    is entitled "Waiver of an Indictment," and I see what appears

 5    to be your signature.

 6              Did you, in fact, sign that waiver?

 7              THE DEFENDANT:  Yes, I did.

 8              THE COURT:  Now, before you signed the waiver, did

 9    you discuss it thoroughly with your counsel?

10              THE DEFENDANT:  Yes, I did.

11              THE COURT:  And did they explain to you that under

12    the laws and Constitution of the United States, you have an

13    absolute right to require the federal prosecutors to go before

14    a group of people called a federal grand jury with the evidence

15    that they've developed concerning your being involved in a wire

16    fraud scheme?

17              Do you understand that?

18              THE DEFENDANT:  Yes, I do.

19              THE COURT:  Now, a federal grand jury is made up of

20    anywhere from 16 to 23 ordinary citizens who are brought

21    together on a random basis, and the job of a grand jury is to

22    review possible felony-level federal cases before they actually

23    go public.

24              Do you understand that?

25              THE DEFENDANT:  Yes, I do.
```

6

1          THE COURT:  So what happens in the grand jury

2    process, which is a secret process, is a prosecutor like

3    Mr. Hanly will go into the room, advise the grand jurors that

4    he believes the person has committed a crime or multiple

5    crimes, and then he'll present evidence to the grand jurors

6    supporting that position.  Now, that could be the testimony of

7    witnesses.  It could be photographs, charts, whatever evidence

8    is needed.

9          Then the prosecutor leaves, and so just the grand

10   jurors are alone together, and if at least 12 members of the

11   grand jury are satisfied that the evidence presented

12   establishes probable cause to believe that the crime or crimes

13   have been committed by that person, the grand jury will issue a

14   document called an indictment, and that is normally how a

15   felony-level prosecution begins in federal court.

16          Do you understand that?

17          THE DEFENDANT:  Yes, I do.

18          THE COURT:  So that grand jury process is considered

19   to be a way of protecting a person's rights because it exists

20   to make sure that a person is not publicly charged with serious

21   criminal activity without there being a factual basis to

22   support the charge.

23          Do you understand that?

24          THE DEFENDANT:  Yes, I do.

25          THE COURT:  Now, a person can give up her right to

1    that grand jury review process, and that would be done by

2    signing a waiver of indictment, such as the one you have

3    signed.  In the law, the word "waiver" means to give something

4    up, so by giving up the grand jury review process, you are

5    forgoing that review, and instead, you're allowing the

6    prosecutors to come to court this afternoon and file this fraud

7    charge against you without the charge having been tested by a

8    grand jury.

9              Do you understand that?

10             THE DEFENDANT:  Yes, I do.

11             THE COURT:  Now, other than your plea agreement,

12   which we will get to in a second, do you believe that anybody

13   has promised or suggested to you that by waiving indictment,

14   you would get a lighter sentence or more favorable treatment by

15   the Court?

16             Other than your plea agreement, do you believe that

17   anybody has promised or suggested to you that by waiving

18   indictment, you would get a lighter sentence or more favorable

19   treatment by the Court?

20             THE DEFENDANT:  No.

21             THE COURT:  Has anyone put any force or pressure on

22   you to waive indictment today?

23             THE DEFENDANT:  No.

24             THE COURT:  And, counsel, have you had enough time to

25   go over this waiver with your client?

8

1          MR. FINCI:  I have, Your Honor.

2          THE COURT:  Are you satisfied that Ms. McPhun is

3    entering her waiver in a knowing and voluntary fashion?

4          MR. FINCI:  I am, Your Honor.

5          THE COURT:  All right.  Then based upon these answers

6    to the Court's questions, I'm finding that this has been a

7    waiver entered with the full advice of counsel and done in a

8    knowing and voluntary fashion.  So the waiver is accepted, and

9    that allows the government to file the following charge, and

10   that is, that on or about March 10 of 2017, in the Eastern

11   District of Virginia and elsewhere, that you, the defendant

12   herein, devised a scheme and artifice to defraud and to obtain

13   money by means of materially false and fraudulent pretenses and

14   representations from M.W. in order to provide money to Keisha

15   Williams.

16          Having devised the scheme, you knowingly caused to be

17   transmitted by means of wire communications in interstate

18   commerce writings, signs, and signals for the purpose of

19   executing the scheme and artifice to defraud; that is, that you

20   caused Christian D'Andrade in California to exchange text

21   messages with Keisha Williams in this district for the purpose

22   of obtaining for the defendant and M.W. the account information

23   for Keisha Williams' Bank of America account for M.W. to then

24   use when wiring money from her bank in Maryland to Keisha

25   Williams' account.

9

1          Do you understand the nature of the wire fraud count?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And to that charge, how do you want to

4    plead, guilty or not guilty?

5          THE DEFENDANT:  Guilty.

6          THE COURT:  Now, before the Court accepts your guilty

7    plea, I'm going to go over with you a series of questions about

8    your plea agreement and the facts of the case.  If at any point

9    this afternoon you change your mind and decide you don't want

10   to go forward with a guilty plea, you can stop the process and

11   withdraw your plea, and we will enter a plea of not guilty, and

12   we will set this case for a trial within the next 70 days.

13          Do you understand that?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  Now, the plea agreement that's been filed

16   in court this afternoon is 12 pages long, and I see on page 12

17   with the date of August 20 what appears to be your signature.

18   Did you, in fact, sign the written plea agreement?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And you signed it almost a month ago; is

21   that correct?

22          THE DEFENDANT:  Yes, I did.

23          THE COURT:  Now, before you signed the plea

24   agreement, did you read it over for yourself word for word?

25          THE DEFENDANT:  Yes, I did.

1      THE COURT:  And when did you first see the plea

2  agreement?  Was it the day you signed it, or had you seen it

3  before then?

4      THE DEFENDANT:  Before then?

5      THE COURT:  All right.

6      THE DEFENDANT:  Before then, yes.

7      THE COURT:  So I assume you had been discussing a

8  possible plea with your attorneys for some time before

9  August 20; is that correct?

10      THE DEFENDANT:  Yes.

11      THE COURT:  All right.  But on August 20, when you

12  signed the plea agreement, do you feel you'd had enough time to

13  thoroughly discuss it with your lawyers?

14      THE DEFENDANT:  Yes.

15      THE COURT:  Have you asked your attorneys everything,

16  all the questions that you have about this plea agreement?

17      THE DEFENDANT:  Yes, I did.

18      THE COURT:  Have they answered all of your questions

19  to your satisfaction?

20      THE DEFENDANT:  Yes, they did.

21      THE COURT:  And do you understand that if you have

22  any questions, you can ask me or ask your counsel?  Do you

23  understand that?

24      THE DEFENDANT:  Now I do.

25      THE COURT:  Do you have any questions you want to ask

1    me about the plea agreement?

2              THE DEFENDANT:  Not at this time.

3              THE COURT:  All right.  And if at any point this

4    afternoon while we're asking this dialogue, if you have a

5    question, you can stop and you can ask your attorneys, or you

6    can ask me.  Do you understand?

7              THE DEFENDANT:  Yes, I do.

8              THE COURT:  All right.  Now, do you have a copy of

9    your plea agreement with you right there?  I want you to turn

10   to page 12.  That's the page that has your signature on it.

11             Do you have it there?

12             THE DEFENDANT:  Yes, I do.

13             THE COURT:  All right.  I want you to look at the two

14   sentences right above your signature.  They go, "I have read

15   this plea agreement and carefully reviewed every part of it

16   with my attorneys.  I understand this agreement and voluntarily

17   agree to it."

18             Do you see those two sentences?

19             THE DEFENDANT:  Yes, I do.

20             THE COURT:  Are they completely true?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Now, by telling the Court that you've

23   read the entire plea agreement and discussed it thoroughly with

24   your attorneys and you understand it and you're voluntarily

25   agreeing to it, that means you will be bound by everything

1  that's written in this 12-page document even if I don't go over

2  every paragraph or page with you in court today.

3          Do you understand that?

4          THE DEFENDANT:  Yes, I do.

5          THE COURT:  And the reason for that result is that

6  this plea agreement is really a written contract between you

7  and the United States government, and when a person signs a

8  written contract after she's carefully discussed it with an

9  attorney and she understands it when she signs it and she signs

10 it voluntarily, then that becomes a binding legal document, and

11 you can't just come back to court in a couple of weeks and say,

12 well, you thought more about it; you don't like what's on page

13 4, for example.  That's too late.

14         Do you understand that?

15         THE DEFENDANT:  Yes, I do.

16         THE COURT:  Now, other than this written plea

17 agreement, do you believe you have any side deals or side

18 understandings with any prosecutor, investigator, or anybody

19 else concerning this case?

20         THE DEFENDANT:  No, I do not.

21         THE COURT:  And, counsel, is that correct that there

22 are no other deals?

23         MR. FINCI:  There are no other agreements, Your

24 Honor.

25         THE COURT:  All right.  And let's turn to page 1,

1  paragraph 1.  There it says you've agreed to waive indictment,

2  which you've done, and enter a guilty plea to the single-count

3  information that I've explained to you.

4         Do you understand that the offense of wire fraud is a

5  felony that exposes you to up to 20 years of imprisonment

6  followed by a period of supervised release which could be as

7  long as three years?  Do you understand that?

8         THE DEFENDANT:  Yes, I do.

9         THE COURT:  In addition, the fine could be as much as

10  $250,000, or twice the amount of gross gain or loss resulting

11  from the offense.  You could be required to make restitution,

12  and there will be an automatic special assessment of $100.

13         Do you understand that?

14         THE DEFENDANT:  Yes, I do.

15         THE COURT:  Now, in this case, there is restitution

16  that's spelled out, and the restitution is listed in paragraph

17  8, but includes $100,000 to somebody identified as M.W.; and

18  you've also agreed to pay E.M. $10,000; D.T. $23,000; I.H.

19  $10,000; and J.V. $250,000.

20         Is that part of your understanding of the agreement?

21         THE DEFENDANT:  Yes, it is.

22         THE COURT:  All right.  Now, parole is not available

23  in the federal system, and that means whatever term of

24  imprisonment that's imposed must be fully served.  Do you

25  understand that?

14

1           THE DEFENDANT:  Yes, I do.

2           THE COURT:  When the prison portion of a sentence has

3    been satisfied, that's when the supervised release portion goes

4    into effect.  When a person is on supervised release, she's

5    under the control of a federal probation officer, and there may

6    be requirements to do certain things as well as requirements

7    not to do certain things, and I cannot at this time tell you

8    the specific conditions of supervision because I haven't seen

9    the pre-sentence report, but what you need to understand at

10   this point is that if you violate any condition of supervised

11   release, you can be brought back to court, and if the violation

12   is established, you could be sent back to prison for as long as

13   the period of supervised release, which in this case could be

14   as much as three years.

15           Do you understand that?

16           THE DEFENDANT:  Yes, I do.

17           THE COURT:  Now, when it comes time for sentencing,

18   the Court will be looking at two sources of law:  the Federal

19   Sentencing Guidelines and Section 3553(a) of Title 18 of the

20   United States Code.

21           With the guidelines, the Court must make two factual

22   decisions before the guidelines can be calculated.  First we

23   have to determine your criminal history.  Criminal histories

24   are divided into six categories, with each category getting a

25   number.

15

1          A  No.  I  criminal  history  would  go  to  someone  who's

2    never  been  in  trouble  with  the  law  or  who  has  a  very  minor

3    record,  and  then  as  convictions,  probation  violations,  the  time

4    between  offenses,  and  other  things  occur  in  the  history,  it

5    will  go  up,  with  a  level  VI  going  to  the  most  serious

6    offenders.

7          Do  you  understand  that?

8          THE  DEFENDANT:   Yes,  I  do.

9          THE  COURT:   Then  the  Court  must  determine  the  offense

10   level.   Now,  every  federal  crime  has  a  number  given  to  it  by

11   the  Sentencing  Commission.   That's  called  the  base  or  bottom

12   offense  level.   And  then  depending  upon  the  specific  facts  of

13   the  case,  that  number  can  go  up  or  down.

14          Now,  in  your  plea  agreement,  and  this  is  in  paragraph

15   4  on  page  --  I  don't  think  the  --  this  page  is  not  numbered,

16   but  it's  paragraph  4,  in  subparagraphs  (a)  and  (b),  you-all

17   have  agreed  to  certain  guideline  factors.   In  paragraph  4(a),

18   you've  agreed  that  the  offense  level  here  will  be  a  base

19   offense  level  of  7,  and  then  it  should  be  increased  eight

20   levels  because  the  loss  amount  is  between  $95,000  and  $150,000.

21          Is  that  part  of  your  understanding?

22          THE  DEFENDANT:   Yes.

23          THE  COURT:   Now,  then  in  paragraph  4(b),  the  parties

24   have  agreed  that  there  should  be  no  other  enhancements,  that

25   means  increases,  to  the  offense  level.   Furthermore,  it's  --  in

1   that paragraph, it's provided that if you continue to assist

2   the government and fully accept responsibility, then the

3   government will file a motion asking that you get an additional

4   level reduction for acceptance of responsibility.  The normal

5   levels for -- of reduction for acceptance of responsibility are

6   two levels, but if the government files a motion, a person can

7   get a third level.

8           Now, is that part of your understanding as well?

9           THE DEFENDANT:  Yes, it is.

10          THE COURT:  All right.  Now, I first of all want to

11  make sure you understand that nothing in paragraph 4 binds or

12  limits the probation officer or the Court.  It just limits the

13  parties.

14          Do you understand that?

15          THE DEFENDANT:  I'm -- can you repeat that?

16          THE COURT:  Yes.  Paragraph 4 is only binding on the

17  prosecutors and on you and your attorneys.  It doesn't limit

18  the Probation Office.  In other words, the Probation Office,

19  when it prepares the pre-sentence report, may find different

20  guideline numbers.

21          Do you understand that?

22          THE DEFENDANT:  Yes, I do.

23          THE COURT:  All right.  Moreover, the Court's not

24  required to accept these numbers.  I could find your offense

25  level is higher or lower, for example, than what's in the plea

1    agreement.  There may be other enhancements, a vulnerable

2    victim, I don't know, abuse of a position of trust.  Those are

3    types of things that can increase an offense level, and

4    although you-all aren't going to be able to argue about those,

5    the Probation Office may recommend to the Court that we use

6    them, and I may choose to use them, and that doesn't violate

7    your plea agreement.

8            Do you understand that?

9            THE DEFENDANT:  Yes, I do.

10           THE COURT:  But at the end of the analysis, the Court

11   will make the decision as to what is your criminal history and

12   what is the offense level.  Those two numbers are then put on a

13   one-page chart, and that establishes what is called the

14   advisory guideline range.

15           Now, the Court must look at that range and consider

16   it in determining the appropriate sentence, but the Court is

17   not required to sentence within it, and if the Court has good

18   reasons, it can sentence above the range or below the range.

19           Do you understand that?

20           THE DEFENDANT:  Yes, I do.

21           THE COURT:  In addition to the guidelines, the Court

22   also will look at the 3553(a) factors.  So, for example, we're

23   going to look at your entire background, your entire employment

24   background, your financial background, your medical situation,

25   your family background, your role in this overall conspiracy,

1   because Keisha Williams is involved apparently with quite a few

2   other people in criminal activity, and this all appears to be

3   interrelated.

4           We're certainly going to look at whether you brought

5   anybody into this overall scheme.  We have to consider

6   deterrence, that is, making sure that you don't engage in this

7   conduct again, as well as sending out a general message of

8   deterrence to others.  So there's a lot of factors that go into

9   the sentencing decision.

10          Do you understand that?

11          THE DEFENDANT:  Yes, I do.

12          THE COURT:  Now, I'm going to assume that you've

13  spent a lot of time, because most defendants do this, in

14  talking with your attorneys about the possible sentence you

15  might get in this case.

16          Have you done that?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And your attorneys may have given you

19  some estimates or, for that matter, the prosecutors may have

20  given you some estimates as to what kind of a punishment or

21  sentence they think you're looking at in this case.  Has that

22  happened?

23          THE DEFENDANT:  Yes.

24          THE COURT:  I want to make sure you understand that

25  no matter what your lawyers or the prosecutors or the case

1  agents or anyone else may have told you they think your

2  sentence may be, none of those discussions are binding on the

3  Court, and so if at your sentencing hearing you receive a

4  sentence that is different from what you might be expecting or

5  hoping for, that is not a violation of your plea agreement, and

6  it will not give you a basis to withdraw your guilty plea.

7         Do you understand that?

8         THE DEFENDANT:  Yes, I do.

9         THE COURT:  Defendants normally have the right to

10  appeal both their conviction and their sentence, but if you

11  look at paragraph 5 of your plea agreement, this is on the page

12  numbered 4, and it's the second sentence, beginning with the

13  word "Nonetheless," as a condition of this plea agreement, you

14  are knowingly waiving -- that same word, which again means

15  giving up -- your right to appeal both your conviction for this

16  wire fraud charge and any sentence as long as the sentence is

17  not greater than the statutory maximum.

18         That means as long as the Court does not sentence you

19  to more than twenty years in prison followed by three years of

20  supervised release and the fine does not exceed the statutory

21  limits and the special assessment is not more than $100, you

22  cannot appeal that sentence for any reason.  If you were to

23  file an appeal, it will be summarily dismissed because you've

24  given up your right to appeal.

25         Do you understand that?

20

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  Now, in exchange for your guilty plea,

3   the government has agreed in paragraph 9 not to further

4   prosecute you in this district for any of the activities

5   described either in the criminal information or the statement

6   of facts.  Now, do you understand that paragraph 9 is not going

7   to protect you from being prosecuted in any other jurisdiction?

8          So technically, California probably could prosecute

9   you for some of your activities connected with this case,

10  possibly, or if you're involved in some other criminal activity

11  in the Eastern District of Virginia, you're also not protected

12  from that.  Do you understand?

13         THE DEFENDANT:  Yes, I do.

14         THE COURT:  Now, in paragraph 10, you've agreed to

15  cooperate with the United States, and that cooperation is

16  described in subparagraphs (a) through (g) but includes among

17  other things your testifying truthfully and completely at any

18  trials, grand juries, or other proceedings; being reasonably

19  available for pretrial debriefings; and providing the

20  government access to any evidence it might need for a criminal

21  case.

22         Do you understand that?

23         THE DEFENDANT:  Yes, I do.

24         THE COURT:  In paragraph 11, the government has

25  agreed it will not use against you either to increase your

1   sentence or to bring a new prosecution any completely truthful

2   information you provide under paragraph 10. Do you understand

3   that?

4           THE DEFENDANT: Yes, I do.

5           THE COURT: Now, defendants who cooperate with the

6   government normally do so with the hope that that will help

7   them with their sentence, and that issue is addressed in

8   paragraph 14 of your plea agreement.

9           There are two types of motions that can be filed only

10   by the prosecutors; defense counsel can't file them; and these

11   are based upon a person's cooperation. The first would be a

12   motion under 5K1.1 of the sentencing guidelines, which gets

13   filed either before or at the sentencing hearing, and that kind

14   of a motion asks the Court to sentence below the guideline

15   range because of a defendant's cooperation and substantial

16   assistance.

17           The other type of motion is a Rule 35(b) motion,

18   which gets filed after the person has actually been sentenced

19   and is actually usually in prison doing time.

20           And what you need to understand is the government has

21   not promised or guaranteed you that they're going to file one

22   of these motions, so even if you've sat down and talked with

23   the agents, even if you've testified in the grand jury, if the

24   government is not satisfied that you've told them absolutely

25   everything that you know or they feel that you haven't been of

22

1    any help to them and they choose not to file one of those

2    motions, that is not a violation of the plea agreement.

3              Do you understand that?

4              THE DEFENDANT:  I'm sorry to do this, but can you

5    repeat that?

6              THE COURT:  Sure.

7              THE DEFENDANT:  Because that was a lot.

8              THE COURT:  The government has not promised or

9    guaranteed you that they're going to file one of those motions.

10   Do you understand that?

11             THE DEFENDANT:  Yes, I do.

12             THE COURT:  So even if you've talked with the agents,

13   even if you testify at trial, if they don't think you told them

14   everything that you know or if they don't think it helped them

15   in any respect and they choose not to file one of these

16   motions, that is not a violation of the plea agreement because

17   they haven't promised you they're going to file the motion.

18             Do you understand that?

19             THE DEFENDANT:  I do.

20             THE COURT:  And you would -- it would not give you a

21   basis to withdraw your guilty plea because there's been no

22   violation of the plea agreement.  Do you understand that?

23             THE DEFENDANT:  I do.

24             THE COURT:  Moreover, the Court's not required to

25   grant those motions.  Even if it were filed, let's say a 5K1

23

1    motion, the Court might find no -- there's no basis to depart

2    from the guidelines.  If that were the Court's decision, it

3    would not violate your plea agreement.

4              Do you understand that?

5              THE DEFENDANT:  Yes, I do.

6              THE COURT:  All right.  Now, have you had -- and I

7    take it there's no forfeiture in this case.  There's just

8    restitution; is that correct?

9              MR. HANLY:  That's correct, Your Honor.

10             THE COURT:  All right.  Have you had enough time to

11   tell your lawyers everything you know about this case?

12             THE DEFENDANT:  Yes, I did.

13             THE COURT:  Have they discussed with you the nature

14   of this mail fraud charge and any ways you could possibly

15   defend yourself against the charge if you pled not guilty and

16   you went to trial?

17             THE DEFENDANT:  I'm sorry, you said this mail, mail

18   fraud?

19             THE COURT:  I'm sorry, wire fraud.

20             THE DEFENDANT:  Wire fraud, yes, yes.

21             THE COURT:  Okay.  And, counsel, did you get

22   discovery in this case?

23             MR. FINCI:  No, Your Honor.  We didn't get discovery

24   in this case, no, but we had a reverse proffer and other

25   opportunities to review the government's case, but not

1    discovery.

2            THE COURT:  You didn't get any discovery at all?  The

3    government didn't at least make you a proffer as to the

4    evidence that they had?

5            MR. FINCI:  Oh, yes, yes.  They made a proffer and

6    showed us some material.

7            THE COURT:  Well, the material --

8            MR. FINCI:  I apologize, Your Honor.  We received FBI

9    302s of our client's statement and some statements of witnesses

10   that were relevant to the decision-making process.  We had a

11   reverse proffer with the government, went over their entire

12   case against our client, and we had sessions with the

13   government.

14           THE COURT:  Well, that's discovery.

15           MR. FINCI:  Right.  But in the nature of a huge

16   number of documents, we didn't get, but yes, you're correct,

17   Your Honor.  That's more, that's more of the nature of what we

18   had in this case.

19           THE COURT:  Well, I mean, are you as an attorney

20   satisfied that you saw enough of the government's evidence that

21   you could fully advise your client as to the strengths and

22   weaknesses of the government's case?

23           MR. FINCI:  Oh, yes.

24           THE COURT:  All right.  And, Ms. McPhun, are you

25   satisfied that your lawyers had enough information to be able

1    to adequately advise you about what to do?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Were you satisfied with how your counsel

4    negotiated on your behalf?

5              THE DEFENDANT:  Yes.

6              THE COURT:  And, counsel, just for the record, was

7    this the only plea you could get, or did you try to get

8    something else?  I mean, this is a wire fraud count that you

9    got here.

10             MR. FINCI:  As far as getting something else, no,

11   Your Honor.  There were negotiations to reduce -- this is not

12   the first offer that has been accepted, if that's what you're

13   asking.  The count didn't change.

14             THE COURT:  Did you try to get a 371 conspiracy, for

15   example?

16             MR. FINCI:  We did not try to get a 371 conspiracy,

17   Your Honor.

18             THE COURT:  All right.  But, I mean, did you keep

19   Ms. McPhun completely advised as to your negotiating efforts?

20             MR. FINCI:  Yes, Your Honor.

21             THE COURT:  And, Ms. McPhun, did you feel that your

22   lawyers kept you fully advised as to what they were doing with

23   the government?

24             THE DEFENDANT:  Yes.

25             THE COURT:  All right.  Are you fully satisfied with

1    the way your lawyers have worked for you in this case?

2                THE DEFENDANT:  Yes.

3                THE COURT:  And do you understand you still at this

4    moment have a right to change your mind and plead not guilty?

5    Do you understand that?

6                THE DEFENDANT:  Yes.

7                THE COURT:  If you did, then the case would get set

8    for trial, and at trial, the burden would be on the government

9    to prove your guilt, and that's a proof beyond a reasonable

10   doubt is the standard they must meet in order for you to be

11   found guilty at trial.

12               Do you understand that?

13               THE DEFENDANT:  Yes.

14               THE COURT:  Now, if you did go to trial, there are

15   certain rights and protections that you would have at trial

16   that you essentially give up by pleading guilty.  At trial, you

17   could see all the government's witnesses and evidence and test

18   all of that information through the questions of your lawyers.

19               Do you understand that?

20               THE DEFENDANT:  Yes.

21               THE COURT:  You could ask the Court for help in

22   getting witnesses and/or physical evidence brought to the

23   courthouse by having the Court issue subpoenas.  Do you

24   understand that?

25               THE DEFENDANT:  Yes.

27

1          THE COURT:  You could testify at trial as a witness.

2    Do you understand that?

3          THE DEFENDANT:  Yes.

4          THE COURT:  You could also choose not to testify

5    because you have that right under the Fifth Amendment to the

6    Constitution, and if you remained silent at trial, no inference

7    of guilt could be drawn from your silence.  Do you understand

8    that?

9          THE DEFENDANT:  Yes.

10          THE COURT:  You would, of course, have the right to

11    be represented by an attorney throughout your trial.  If you

12    could not afford to pay for trial counsel, we would make sure

13    you had counsel appointed for you at taxpayers' expense.

14          Do you understand that?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Now, there are two ways in which a case

17    can be tried.  The first is to a judge alone, which we call a

18    bench trial.  The second type of trial is a jury trial, in

19    which case 12 ordinary citizens are brought together to hear

20    the case, but in either type of trial, the burden is the same

21    on the government, and that is, a person cannot be found guilty

22    unless the government proves guilt beyond a reasonable doubt.

23          Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And in order for them to do that, they'd

1    have to again prove each and every element of the offense

2    beyond a reasonable doubt.  So they would have to be able to

3    prove, for example, that on or about the date they've alleged,

4    which is March 10, 2017, in this district, that you devised a

5    scheme and artifice to defraud or to obtain money by means of

6    making a false or fraudulent pretense to a victim, in this case

7    M.W.; and they would have to prove beyond a reasonable doubt

8    that in furtherance of this scheme, at some point, you caused

9    wire communications to cross state or interstate lines.

10           And that's the essence of this case.  Do you

11   understand that?

12           THE DEFENDANT:  Yes.

13           THE COURT:  All right.  Now, in addition to the

14   rights I've just explained to you, if you had a jury trial, a

15   jury would have to be unanimous in order to reach a decision,

16   and that means if just one juror had a reasonable doubt about

17   your guilt, that jury could not convict you.  It would be what

18   we call a hung jury.  We'd have to declare a mistrial, and

19   you'd have a right to a new trial with a new jury.

20           Do you understand that?

21           THE DEFENDANT:  Yes.

22           THE COURT:  If you continued with a not guilty plea,

23   your lawyers could try to attack the prosecution's case, and I

24   don't know if there are any bases that might be successful,

25   but, for example, I understand you may have made some

1    statements to law enforcement.  If there were legal defects in

2    how those statements were obtained, for example, you didn't get

3    *Miranda* warnings when you should have or if you were under

4    duress, it might be that that evidence could be kept out of the

5    case.

6            There may or may not be an adequate basis to show

7    that the wires were used.  I don't know what, if any, defenses

8    you might have, but what you need to understand is that when a

9    person pleads guilty, she gives up any and all attacks on the

10   prosecution's case except for an attack on the jurisdiction of

11   the Court.

12           Do you understand that?

13           THE DEFENDANT:  Yes.

14           THE COURT:  And lastly, if you pled not guilty and

15   you went to trial and you were found guilty at trial, you could

16   appeal that finding of guilt to a higher-level court.  Do you

17   understand that under the terms of your plea agreement as well

18   as the way the law is structured, by being found guilty based

19   upon your guilty plea, you give up your right to appeal your

20   conviction?

21           Do you understand that?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Other than the written plea agreement

24   which is in court this afternoon, do you believe that anybody

25   has promised or suggested to you that by pleading guilty rather

1   than going to trial, you would get a lighter sentence or more

2   favorable treatment by the Court?

3          THE DEFENDANT:  No.

4          THE COURT:  Has anyone put any force or pressure on

5   you to plead guilty today?

6          THE DEFENDANT:  No.

7          THE COURT:  And again, is there anything about your

8   medical condition, your tendency to have panic attacks, or any

9   of that sort of thing that you feel has put pressure on you to

10  plead guilty today?

11         THE DEFENDANT:  No.

12         THE COURT:  All right.  The last document that we

13  need to go over, and this document is incorporated in your plea

14  agreement, is a written statement of facts.  The statement of

15  facts is four pages long, and I see what appears to be your

16  signature and the date of August 20 on the last page.

17         Did you, in fact, sign the statement of facts?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And before signing it, did you carefully

20  read over the eight numbered paragraphs that precede your

21  signature?

22         THE DEFENDANT:  Yes.

23         THE COURT:  And do you understand that by signing the

24  statement, you did two things:  You admitted the truth of

25  everything in those eight numbered paragraphs, and you admitted

```
 1    that if the case had gone to trial, the government could have
 2    proven all those facts beyond a reasonable doubt.
 3            Do you understand that?
 4            THE DEFENDANT:  I understand that.
 5            THE COURT:  All right.  Then as I understand it, you
 6    live in Maryland; is that correct?
 7            THE DEFENDANT:  Yes, I do.
 8            THE COURT:  And you met Christian -- how does he
 9    pronounce his name, "D'Andrade"?
10            THE DEFENDANT:  "D'Andrade."
11            THE COURT:  "D'Andrade"?  And you met him in 2014?
12            THE DEFENDANT:  Yes.
13            THE COURT:  What was the social function?
14            THE DEFENDANT:  My fiance's sister had a cookout, a
15    barbecue.
16            THE COURT:  And so she knew him?
17            THE DEFENDANT:  Yes.
18            THE COURT:  All right.  And then there's a gap of
19    three years.  Did you have any contact with him during those
20    three years between 2014 and 2017?
21            THE DEFENDANT:  Just maybe another function or two
22    but we didn't speak.
23            THE COURT:  All right.  Then it says in paragraph 2
24    that in January of 2017, you learned about a health care
25    software that he was involved in purchasing.  How did you learn
```

1   about that?

2           THE DEFENDANT:  My fiance's sister told me about it.

3           THE COURT:  All right.  As a result, then you spoke

4   to him; is that correct?

5           THE DEFENDANT:  Yes.

6           THE COURT:  And how did you do that?  By phone?

7   e-mail?  How did you do it?

8           THE DEFENDANT:  By phone.

9           THE COURT:  All right.  And he told you at that point

10  that he needed money to pay interest and fees so that he and

11  his partner, Keisha Williams, could complete the purchase; is

12  that correct?

13          THE DEFENDANT:  That's correct.

14          THE COURT:  How much money did he need?

15          THE DEFENDANT:  At the time, I believe it was 210.

16          THE COURT:  210,000 or --

17          THE DEFENDANT:  Yes.

18          THE COURT:  210,000?

19          THE DEFENDANT:  210,000.

20          THE COURT:  All right.  And then he indicated that

21  the money would be repaid in less than 30 days; is that

22  correct?

23          THE DEFENDANT:  That is correct.

24          THE COURT:  So as a result of that, you agreed to

25  loan him money?

33

1              THE DEFENDANT:  Yes.

2              THE COURT:  Did you have that much money yourself?

3              THE DEFENDANT:  No, I did not.

4              THE COURT:  So how were you planning to get the

5    money?

6              THE DEFENDANT:  I had a young lady that I worked

7    with, she's a business associate that I worked with in real

8    estate, and I asked her to put in the money.

9              THE COURT:  So she had access to $230,000?

10             THE DEFENDANT:  Yes, um-hum.

11             THE COURT:  And did she do that?

12             THE DEFENDANT:  Yes, she did.

13             THE COURT:  All right.  And it says then in paragraph

14   3 that he did not repay you.  Is that correct?

15             THE DEFENDANT:  That is correct.

16             THE COURT:  So how did you handle that with your,

17   with your business colleague?

18             THE DEFENDANT:  Well, we were promised that -- by

19   D'Andrade that the delays would give us extra interest, so I, I

20   just let the client know that, and she said that was fine.

21             THE COURT:  Now, did there come a time when you wound

22   up speaking directly with Williams rather than D'Andrade?

23             THE DEFENDANT:  That was only three weeks before her

24   arrest.

25             THE COURT:  All right.  But did she make statements

1  to you similar to the ones he had been making about their

2  repaying you?

3          THE DEFENDANT:  On three-way conversations at times.

4          THE COURT:  Now, it indicates that you invested

5  approximately $300,000 of your own money and you obtained

6  approximately $1 million for D'Andrade and Williams from

7  others.  Is that correct?

8          THE DEFENDANT:  That is correct.

9          THE COURT:  And is it you yourself who got the

10 million dollars, or was it your partner who was getting the

11 money?

12         THE DEFENDANT:  No, it was me from the clients that I

13 worked with in the past.

14         THE COURT:  All right.  And it indicates then in

15 paragraph 5 that in March of 2017, D'Andrade told you that he

16 and Williams needed additional money.  Is that correct?

17         THE DEFENDANT:  Yes, that is correct.

18         THE COURT:  All right.  And he said that the money

19 was needed to pay fees to the bank that would be receiving

20 millions in loan proceeds into Williams' account; is that

21 correct?

22         THE DEFENDANT:  That is correct.

23         THE COURT:  And that you in order to raise that money

24 convinced M.W. to provide $100,000, and that you told M.W. that

25 the money was to be used to help pay -- I'm sorry, that instead

1    of telling M.W. that the money was to be used to pay bank fees,

2    you told M.W. the money would be used on two real estate

3    projects in Maryland.

4              Is that correct?

5              THE DEFENDANT:  That is correct.

6              THE COURT:  And that's a false statement.  Do you

7    agree with that?

8              THE DEFENDANT:  Yes, I do.

9              THE COURT:  It looks like you want to add something.

10             THE DEFENDANT:  Yes.  We --

11             MR. FINCI:  Can I talk to you?

12             Can I beg your indulgence, Your Honor?

13             THE COURT:  Yes, go ahead.

14             MR. FINCI:  Thank you.

15             (Discussion between Mr. Finci and the defendant off

16   the record.)

17             THE DEFENDANT:  Okay.  I'm good.

18             THE COURT:  Did you want to add anything or not?

19             THE DEFENDANT:  No, I'm good.  Thank you.

20             THE COURT:  All right.  And is it correct that at the

21   end of the day, that Williams instructed you to get M.W. to

22   wire the money that M.W. was supposedly investing in this real

23   estate directly to Williams' account?

24             THE DEFENDANT:  Yes, but it was told through

25   D'Andrade because I dealt with D'Andrade.

1          THE COURT:  All right.  But you still ultimately, you

2    were the one who ultimately told M.W. to wire the money to

3    Williams' account?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right.  And you understand that that

6    would constitute the act of using the wires to further the

7    fraud?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you understand if the Court accepts

10   your guilty plea today, there'll be no further trial of the

11   issue, and you will be found guilty?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Do you claim in any respect that you're

14   innocent of the charge of wire fraud?

15         THE DEFENDANT:  Not based on the guidelines.

16         THE COURT:  I'm sorry?

17         THE DEFENDANT:  No.

18         THE COURT:  You understand this is your day in court,

19   so if you're ambivalent about this, you're going to have to

20   live with the decision you make today.  Do you feel in any

21   respect you're innocent of the crime of wire fraud?

22         THE DEFENDANT:  No.

23         THE COURT:  How then do you plead to the charge?

24         THE DEFENDANT:  Guilty.

25         THE COURT:  Counsel, have you had enough time to go

```
1   over this plea with your client?

2           MR. FINCI:  I have, Your Honor.

3           THE COURT:  Are you satisfied that the defendant has

4   entered her plea in a knowing and voluntary capacity?

5           MR. FINCI:  Yes, Your Honor.

6           THE COURT:  And that her guilty plea accords with

7   your understanding of the facts and circumstances?

8           MR. FINCI:  Yes, it does, Your Honor.

9           THE COURT:  All right.  Then the Court is satisfied

10  based on all these answers to our questions that the plea has

11  been entered in a knowing and voluntary fashion, with the full

12  advice of competent counsel, and that the written statement of

13  facts is -- plus the oral admissions is more than enough

14  evidence upon which to find the defendant guilty beyond a

15  reasonable doubt.

16          I need to tell the government that when I set the two

17  sentencings this morning, I had forgotten that I'm going to be

18  out of the country that Friday.  Is it possible for you to be

19  available Monday afternoon, December 10, for the sentencings?

20          MS. HILL:  Yes, Your Honor.  That's fine.

21          THE COURT:  All right.  We'll contact defense

22  counsel, and if they're available, the two pleas we took this

23  morning, we'll shift them to 2:00 on Monday, December 10.

24          We need to set bond in this case, I believe, right?

25  The defendant has not previously been on bond?
```

38

1          MR. HANLY:  That's correct, Your Honor.

2          THE COURT:  All right.  Counsel, are you available on

3   Monday, December 10?

4          MR. FINCI:  I am, Your Honor.

5          THE COURT:  All right.  That will be at 2:00.

6          MR. FINCI:  Very well.

7          THE COURT:  All right.  Ms. McPhun, come back up to

8   the lectern.  I'm going to release you on a personal

9   recognizance bond with the following terms and conditions:

10  First of all, you must be of uniform good behavior.  That means

11  you cannot violate any federal, state, or local laws, which

12  includes traffic laws, while you're on bond.

13          Do you understand that?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  Secondly, you must comply with all of the

16  conditions.  They'll be explained to you by the Pretrial

17  Office.  Do you understand that?

18          THE DEFENDANT:  Yes, I do.

19          THE COURT:  Now, specific conditions are that you

20  must reappear in this court on Monday, December 10, at 2 p.m.

21  for sentencing.  Do you understand that?

22          THE DEFENDANT:  Yes, I do.

23          THE COURT:  You must report as they direct on a

24  regular basis to both the Pretrial and Probation Offices.  Do

25  you understand that?

39

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  All right.  Are you currently employed?

3          THE DEFENDANT:  No, I am not.

4          THE COURT:  Are you seeking employment?

5          THE DEFENDANT:  Well, I'm self-employed, but I have

6    not -- I haven't done any business.

7          THE COURT:  Because of the large amount of

8    restitution, I am going to indicate that you should actively

9    seek employment.  Do you understand that?

10          THE DEFENDANT:  Yes, I do.

11          THE COURT:  All right.  You must surrender any

12    passport to the Pretrial Office.  Do you have your passport

13    with you today?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  All right.  Give it to Pretrial.

16          And you are not permitted to obtain a passport or

17    other international travel document.  Do you understand that?

18          THE DEFENDANT:  Yes, I do.

19          THE COURT:  You must continue to reside at your

20    current address, and you may not leave the Washington, D.C.

21    Metropolitan area without prior approval of Pretrial Services

22    or the Court.  Do you understand that?

23          THE DEFENDANT:  Yes, I do.

24          THE COURT:  You cannot have any contact with any

25    codefendants unless in the presence of counsel.  Do you

40

1  understand that?

2          THE DEFENDANT:  Yes, I do.

3          THE COURT:  You may not possess any firearms,

4  destructive devices, or other dangerous weapons.  Do you

5  understand that?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  You may not use alcohol to excess nor may

8  you use or possess any illegal drugs.  Do you understand that?

9          THE DEFENDANT:  Yes, I do.

10          THE COURT:  And lastly, you must notify any employer,

11  customer, or business associate of this conviction.  Do you

12  understand that?

13          THE DEFENDANT:  Yes, I do.

14          THE COURT:  Are there any other conditions of release

15  that the government would be seeking?

16          MR. HANLY:  No, Your Honor.

17          THE COURT:  No?  All right.

18          When you leave court today, you need to first of all

19  sign the bond papers, and then you need to go down to the

20  Marshals Office for fingerprinting and photograph -- being

21  photographed.  That's called processing.

22          Then you need to check in with Pretrial Services so

23  you can hand in your passport, and they will explain to you

24  your obligations under bond, and then you need to go to the

25  Probation Office to sign up for the pre-sentence investigation.

41

1    All right?

2             THE DEFENDANT:  Okay.

3             THE COURT:  All right.  Anything further on this

4    case?

5             MR. HANLY:  No, Your Honor.

6             THE COURT:  No?  All right.  Then we'll recess court

7    for the day.

8             MR. FINCI:  Thank you, Your Honor.  Have a pleasant

9    day.

10                         (Which were all the proceedings

11                          had at this time.)

12

13                    CERTIFICATE OF THE REPORTER

14        I certify that the foregoing is a correct transcript of

15   the record of proceedings in the above-entitled matter.

16

17

18   _____/s/_____
                                    Anneliese J. Thomson
19

20

21

22

23

24

25