UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

UNITED STATES OF AMERICA,

v.

CARLA DONNA MCPHUN,                          Criminal Action No. 1:18-cr-333-LMB

Defendant.

MEMORANDUM IN SUPPORT OF MOTION FOR ORDER AWARDING
RESTITUTION TO VICTIM McDHOLDINGS, LLC

Victim McDHoldings, LLC ("MCDH" or "Movant"), by and through undersigned
counsel and pursuant to Fed. R. Crim. P. 47 and 60, Local Crim. R. 47, and 18 U.S.C. §§ 3663,
3663A, 3664, and 3771, hereby submits this memorandum in support of its Motion for Order
Awarding Restitution to Victim McDHoldings, LLC (the "Motion").   Defendant Carla D.
McPhun ("McPhun") has pled guilty to committing wire fraud in furtherance of a scheme to
dupe multiple victims into providing money that she and Christian E. D'Andrade ("D'Andrade")
claim they provided to Keisha L. Williams ("Williams").   [See Doc Nos 6, 8.]   Though not
identified in the Criminal Information [Doc No 6], Plea Agreement [Doc No 8], or Statement of
Facts [Doc No 9], Movant is perhaps the largest victim of this fraudulent scheme, which,
according to McPhun's Pre-Sentencing Report, was a "scheme to defraud utilizing wire
transmissions by Keisha Williams, Christian D'Andrade, and Carla McPhun," which "occurred
from October 2014 until February 2018," and resulted in over $5.4 million in losses to victims.
[Doc No 15, ¶ 21.]   For McPhun's part in that scheme, she "solicited approximately $1 million
from friends and business associates," which she would then wire to Williams.   [Id.]   For the
reasons set forth herein, Movant seeks restitution from McPhun pursuant to the Victim and

Witness Protection Act (the "VWPA") (18 U.S.C. § 3663), the Mandatory Victim Restitution Act (the "MVRA") (18 U.S.C. § 3663A), the Crime Victims' Rights Act (the "CVRA") (18 U.S.C. § 3771), and the express terms of her Plea Agreement (the "Plea Agreement") [Doc No 8].

## I.     INTRODUCTION[1]

McPhun has known Christian E. D'Andrade ("D'Andrade") since approximately 2014. [Doc No 9, ¶ 1.]  In January 2017, she learned about a health-care software that D'Andrade and Williams were purportedly involved in purchasing.  [Id., ¶ 2.]  McPhun claims she loaned her own money to D'Andrade, and, critically, claimed that "she would try to interest others in loaning him money as well."  [Id.]  Over the course of the next year, McPhun "obtained approximately $1 million for D'Andrade and Williams from others who were willing to loan money."  [Id., ¶ 4.]  Movant was among the "others" referenced, as shown by the Verified Complaint filed by Movant in its civil case (the "Civil Case"), which is currently pending before this Court, and incorporated here by reference.  (See Ex. 1, McDonald, et al. v. Robinson, et al., E.D. Va. Case No. 1:18-CV-00697-LMB-TCB, Doc No 1, ¶¶ 125-219 (Verified Complaint) [hereinafter "(Compl. ¶ __)"].)  Over the course of 2017, McPhun, D'Andrade, and one of their other associates – Edward G. Robinson III ("Robinson") – induced Movant to "loan" them at

---

[1]  The facts and evidence set forth herein present prima facie evidence that Movant is a victim as defined under 18 U.S.C. §§ 3663(a)(2) and 3663A(a)(2).  However, this factual showing is by no means an exhaustive presentation of all evidence of the many crimes committed by McPhun against Movant as part of the scheme.

least $884,000 that they have never repaid, and failed to pay $426,200 in promised returns on investments.  (*See* Compl., ¶¶ 125-219; *see also* Ex. 2, Initial Disclosures.)[2]

## II.   ROBINSON'S AND MCPHUN'S RELATIONSHIPS WITH MOVANT.

Matthew McDonald ("McDonald") is one of three members of Movant MCDH, a family owned LLC which the McDonald family created for the purpose of making investments. McDonald met Robinson in the summer of 2015, when Robinson hired McDonald's architecture firm for several projects.  (Compl., ¶¶ 15-17.)  The following summer, Robinson – on behalf of his company, Edward G. Robinson III Consulting, LLC ("EGIII") – hired McDonald's firm to perform the architectural services for a residential property he was renovating.  (*Id*., ¶ 23.)  On August 14, 2016, Robinson called McDonald to tell him that he would be happy to pay him the amounts owed for that project, but that he could also reinvest those funds with McPhun if he was interested in making some more money.  (*Id*., ¶ 27.)  McDonald was not familiar with McPhun at that time, but Robinson described her as a sophisticated real estate investor who purchased houses in bulk off of foreclosure lists and then flipped them for a profit.  (*Id*., ¶ 28.)

Robinson first induced McDonald to enter into two low-dollar, quick turnaround real estate investments in which EGIII acted as an intermediary.  (*Id*., ¶¶ 25-43.)  Then, using the success of those first two investments as proof of results, Robinson reached out to Movant about investing in more alleged real estate investment projects offered by McPhun or her companies, Cadem Capital Group ("Cadem") and Choice Management, LLC ("Choice Management").  (*See id*., ¶¶ 44-144.)    McPhun, D'Andrade, and Robinson then fraudulently induced Movant into

---

[2]  Exhibit 2 to Movant's Initial Disclosures shows Movant's Fed. R. Civ. P. 26(a)(1)(A)(iii) damages calculation as of September 17, 2018, which was previously produced in the Civil Case.

repeatedly wiring them money as part of the same scheme that is the predicate for the offenses to which McPhun, D'Andrade, and Williams have now pled guilty.

## III.   MCPHUN DEFRAUDED MOVANT WITH RESPECT TO THE SAME SCHEME AS VICTIM M.W.

That Movant is a victim of conduct that is related or similar to the offense of conviction is well illustrated by the circumstances of the $220,000 payment Movant described in its Verified Civil Complaint as Investment 7.  (Compl., ¶¶ 125-151.)  On April 15, 2017, Williams received a text message from D'Andrade stating: "From Carla, I am having them look in to my line of credit checks.  I need the 1.5 [million dollars] to reconcile my debts.  This is why I had to offer excessive interest to delay some people and borrow to pay others who could.  It [sic] wait. . . . Everything is falling apart at the seems [sic] at this point."  (Ex. 3, Williams's Text Messages, Text No. 119619.)[3]

On April 17, 2017, Robinson called McDonald to see if he would extend a short-term loan to McPhun in connection with a real estate deal because the money of one of her other investors – Chris D'Andrade – was tied up for two weeks.  (Compl., ¶ 125.)  Among other misrepresentations made to McDonald, Robinson assured McDonald that McPhun would repay him in two weeks, once D'Andrade could "get his money out."  (*Id*.)  McDonald, as an agent of

---

[3]   In the civil case, Movant served Williams's criminal lawyer, Robert Jenkins, Jr., with a subpoena *duces tecum*.  In response to the subpoena, Mr. Jenkins produced, among other things, a 16 megabyte Excel Spreadsheet containing nearly 200,000 text messages sent from and received by Williams's phone.  The full document is not produced herein, because it is voluminous and contains superfluous information.  Exhibit 3 was created by undersigned counsel by copying complete rows from the Excel Spreadsheet and pasting them into a Word document. The abstract attached as Exhibit 3 is a true and accurate replication of select text messages produced by Mr. Jenkins.  The full, original document can be made available to the Court upon request.

MCDH, then signed an "Investment Partnership Agreement" with McPhun on April 19, 2017. (*Id*., ¶ 129 & Ex. 7.)  This is described in the Verified Complaint as Investment 7.  (*Id*.)  Pursuant to the terms of the Investment 7 Agreement, MCDH agreed to make a $220,000 investment with one of McPhun's companies, Cadem, in exchange for a "Facilitator" delivering a guaranteed 40% return within 30 days (*i.e.*, by May 19, 2017).  (*Id*., ¶ 130.)  It further stated that the "[f]unds will be allocated to the asset backed investment project, known as the Dandrade Project."  (*Id*., ¶ 131.)

While Robinson and McPhun were inducing Movant into Investment 7, on April 18, 2017, Williams instructed D'Andrade to "beg Carla" to obtain money for them, and offered to "give her 2M if she can get us this money by tomorrow."  (Ex. 3, Text No. 120133.)  That day, Williams also provided D'Andrade with the account number and routing number for her bank account at Citibank held by Keisha Williams & Associates Consulting, LLC ("KW&A").  (*Id*. at Text No. 120145.)  Williams then told D'Andrade that "[i]f Carla can pull this off, I will give her an extra 1M," and that McPhun "deserves it if anyone bc she's inundated in this and has busted her A+ to assist us."  (*Id*. at Text Nos. 120154-55.)

On April 19, 2017, the same day McDonald signed the Investment 7 Agreement, D'Andrade texted Williams and told her that "Carla [McPhun]'s guy" was wiring $220,000 to Williams's account.  (Ex. 4, Williams 10/15/18 Trial Tr. 102:11-15; *see also* Ex. 3, Text No. 120711.)  "Carla's guy" was McDonald.  Robinson set up a conference call between him, McDonald, and McPhun on the same day to discuss Investment 7.  (Compl., ¶ 136.)  After that call, McPhun told Robinson to have McDonald wire Movant's $220,000 payment to KW&A c/o Williams.  (*Id*., ¶ 137.)  McDonald, however, refused to wire money to Williams.  (*Id*.)  Robinson then proctored another conference call between McPhun and McDonald.  (*Id*., ¶¶ 138-

39.)  During that call, McPhun falsely told McDonald that Williams would ***not*** be involved with Investment 7 (*i.e.*, the D'Andrade Project), even though McPhun's solicitation of Investment 7 was prompted by Williams asking D'Andrade to beg McPhun to get her more money in exchange for a promise to give McPhun $2 million.  (*Id.*, ¶ 139.)  Later that day, as a result of these false statements and other assurances by McPhun and Robinson about this being a real estate investment, MCDH wired $220,000 to McPhun's personal Wells Fargo bank account. (*Id.*, ¶ 141.)  The following day, April 20, 2017, Williams texted D'Andrade to tell him that "[y]ou should have just had them send the money to you yesterday as I was saying and that way we would've at least had it in our possession.  Even if I would've got it at 12 today, we would've had it already in 'our' possession."  (Ex. 3, Text Nos. 120789-90.)  This corroborates that the purpose of McPhun's request for Movant to pay Williams directly was for McPhun to fulfill Williams's desire to take possession of Movant's funds more quickly.

One week later – on April 26, 2017 – Williams texted D'Andrade to tell him that she had received "the investor's money," referring to Movant's Investment 7 funds.  (Ex. 4, Williams 10/15/18 Trial Tr. at 102:16-21; *see also* Ex. 3, Text No. 122284.)  It is clear from these irrefutable facts that McPhun's statements to McDonald about Williams not being involved with Movant's $220,000 investment were false and were made with fraudulent intent to induce Movant into wiring McPhun $220,000 that she could then funnel to Williams.  (Compl., ¶ 140.)

## IV.    OTHER FRAUDULENT INVESTMENTS IN THE SCHEME.

Neither Cadem nor McPhun repaid Movant's $220,000 from Investment 7, nor did they pay any of the contractually guaranteed $88,000 return promised by the Investment 7 Agreement that induced the fraudulent investment.  (*Id.*, ¶ 142.)  Robinson and McPhun began responding to McDonald's concerns and inquiries about non-payment of Investment 7 with excuses for non-

payment and promises of finding a "work around," which always required an additional investment. (*See id.*, ¶¶ 145-219.)

Between November 2016 and August 2017, McPhun and Robinson fraudulently induced Movant to wire an additional $664,000 to McPhun and her co-conspirators by misrepresenting how Movant's funds were being used.  These transactions are set forth in detail in the Verified Complaint, and shown in the table below, as: (a) Devilwood; (b) Investment 3; (c) Investment 7; (d) Investment 8; (e) Investment 9; (f) Investment 10; (g) Investment 11; and (h) Investment 12. (*See* generally Ex. 1.)

| Transaction | Date of Investment | Principal Investment | Payee of Fraudulent Investment |
|---|---|---|---|
| Devilwood | 11/22/2016 | $150,000 | Choice Management o/b/o McPhun |
| Investment 3 | 02/16/2017 | $35,000 | Edward G. Robinson III Consulting, LLC |
| Investment 7 | 04/20/2017 | $220,000 | McPhun |
| Investment 8 | 05/17/2017 | $10,000 | D'Andrade |
| Investment 9 | 06/05/2017 | $73,000 | D'Andrade |
| Investment 10 | 07/07/2017 | $180,000 | Edward G. Robinson III Consulting, LLC |
| Investment 11 | 08/07/2017 | $160,000 | McPhun |
| Investment 12 | 12/27/2017 | $56,000 | Teresa Bunnag |
| | **TOTAL:** | **$884,000** | |

Over the course of soliciting these investments, McPhun and Robinson deceived Movant by, *inter alia*:

- Falsely telling McDonald that McPhun would use his $150,000 investment in the Devilwood project to purchase, renovate, and sell a parcel of real property in Potomac, Maryland.  (Compl., ¶ 44.)  Land records show the property identified by the Devilwood contract was never purchased by McPhun or her entities.  (*See* Compl., Ex. 2.)

- Inducing Investment 3 by falsely telling McDonald that the $35,000 they solicited would be used for a real estate investment.  (*Id.*, ¶¶ 67, 72.)

- Inducing Investment 7 by falsely telling McDonald that the $220,000 they solicited would be used for a real estate investment.  (*Id.*, ¶ 125.)

- Falsely telling McDonald that D'Andrade and his business partners had purchased a powerful piece of software at a significant discount in Europe, but that the software was being held pending payment of a penalty tax incurred by its prior owner. (*Id.*, ¶¶ 149-50.)

- Falsely telling McDonald that the passport of one of D'Andrade's associates (Williams) had been seized by European authorities to secure payment of the penalty tax for his software, but that if she could get her passport back, she could travel to Dubai and complete another deal that would provide sufficient funds to repay Movant. (*Id.*, ¶ 151.)

- Inducing Investment 8 by falsely telling McDonald that D'Andrade's unexpected issues in Europe had left him without sufficient liquid assets to make his upcoming mortgage payment, and that if D'Andrade did not come up with $20,000 quickly, he risked defaulting on his mortgage. (*Id.*, ¶ 152.)

- Inducing Investment 9 by falsely telling McDonald that Williams was travelling to Dubai to ensure the release of funds to repay McDonald. (*Id.*, ¶¶ 174, 177.)

- Inducing Investment 10 by falsely stating that one of D'Andrade's other investors was dying of cancer, and promising to repay McDonald in full if he gave $180,000 for another real estate endeavor. (*Id.*, ¶¶ 182-83.)

- Inducing Investment 11 by falsely telling McDonald that McPhun knew investors on the West Coast who would loan her $4-5 million dollars with which to repay McDonald, if McDonald gave her an additional $160,000 to pay a loan origination fee. (*Id.*, ¶ 202.)

- Inducing Investment 12 by falsely telling McDonald that McPhun had just received $5 million dollars from selling real property overseas. (*Id.*, ¶ 212.)

- Falsely promising that Movant's investments would be secured. (*See id.*, ¶¶ 173, 190.)

To date, no one has repaid any of Movant's $884,000 lost to the same scheme and artifice to defraud of which the offense to which McPhun pled was a part.[4]

---

[4]  In its civil Complaint, Movant asserts claims for, among other things, civil RICO violations pursuant to 18 U.S.C. 1962(b), (c) & (d). (Compl., Counts I-III.)  Wire fraud is alleged as among the predicate offenses.  (*See generally id.*)  McPhun moved (unsuccessfully) to dismiss these

## V.     THE FBI INVESTIGATION AND WILLIAMS'S INDICTMENT.

On February 16, 2018, Robinson told McDonald that he had been called by an FBI agent asking questions about McPhun and D'Andrade.  (Compl., ¶ 220.)  McDonald initially thought this was another excuse to justify further delays in repayment, but then he saw a news article about Williams's arrest.  (*Id*.)  That article also referenced D'Andrade's involvement with Williams.  (*Id*.)  It was then that McDonald realized Movant was a victim of an elaborate criminal scheme, and that it was not alone.  (*See id*.)

On February 13, 2018, the Government filed a criminal complaint against Williams, alleging that – between October 2014 and February 2018 – she was involved in a conspiracy to commit wire fraud.  *See generally United States v. Williams*, E.D. Va. No. 1:18-CR-160-LMB, Doc No 1.  According to the affidavit (the "FBI Affidavit") submitted to support the criminal complaint against Williams, she and D'Andrade fraudulently solicited loans from investors for the alleged purpose of paying fees to obtain health-care related software called "Zydacron" and get it out of escrow in Europe, but used the funds for other purposes.  *See Williams*, Doc No 2, ¶ 223.  These allegations and the facts set forth in the FBI Affidavit mirror the excuses and explanations that McPhun and Robinson made to Movant in order to induce it to "loan" money to D'Andrade.  *See generally id*.

## VI.    MCPHUN'S GUILTY PLEA AND ADMISSIONS.

On September 17, 2018, McPhun pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343.  [*See* Doc No 8.]  In doing so, she admitted that:

---

claims in the civil case.  Movant's successful opposition brief set forth a summary identifying examples of acts of wire fraud alleged in the Verified Complaint, which Movant refers to here and incorporates by reference.  *See McDonald v. Robinson*, E.D. Va. Case No. 1:18-cv-00697, Doc No 53 at 21-22.

> On or about March 10, 2017, in the Eastern District of Virginia and elsewhere, [she] devised a ***scheme*** and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses and representations from M.W., in order to provide money to Keisha Williams.   Having devised the ***scheme***, [she] knowingly caused to be transmitted by means of wire communications in interstate commerce writings, signs, and signals for the purpose of executing the ***scheme and artifice to defraud***[.]

[Doc No 6 (emphasis added).]   The Statement of Facts supporting the Plea Agreement stipulates that, in furtherance of her scheme and artifice to defraud, McPhun "obtained approximately $1 million for D'Andrade and Williams from others who were willing to loan money."   [Doc No 9 at ¶ 4.]   Thus, she expressly acknowledged there were more victims of the scheme she devised than M.W.

As part of her Plea Agreement, McPhun agreed "to the entry of a Restitution Order for the full amount of the victim's losses," and that "victims of the conduct described in the charging instrument, statement of facts, ***or any related or similar conduct shall be entitled to restitution***." [Doc No 8 at 5 (emphasis added).]   As set forth herein, Movant is a victim of "similar conduct" to that described in the Criminal Information [Doc No 6] and the Statement of Facts [Doc No 9] supporting the Plea Agreement, and is thus entitled to restitution.

## ARGUMENT

## I.   MOVANT IS ENTITLED TO RESTITUTION PURSUANT TO THE VWPA.

Pursuant to the VWPA, "a district court may order a convicted criminal to pay restitution to 'any victim' of his offense."   *United States v. Karam*, 201 F.3d 320, 325 (4th Cir. 2000); *see also* 18 U.S.C. § 3663(a)(1)(A).   The VWPA defines "victim" as:

> A person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

10

18 U.S.C. § 3663(a)(2).  Moreover, restitution orders are broadly permitted to encompass "losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme."  *United States v. Henoud*, 81 F.3d 484, 488 (4th Cir. 1996).  In fact, the Fourth Circuit and other appellate courts have held that, when a defendant pleads guilty to even one count of mail fraud or wire fraud, "the offense of conviction," for purposes of identifying the victims entitled to restitution, "embraces the entire scheme."  *United States v. Bane*, 73 F.3d 358, at *3 (4th Cir. 1995) (unpublished) (collecting cases); *see also United States v. Welsand*, 23 F.3d 205, 207 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 641 (1994); *United States v. Stouffer*, 986 F.2d 916, 928-29 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 115 (1993); *United States v. Turino*, 978 F.2d 315, 317 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 2969 (1993).  As one Court of Appeals held:

> Because a scheme or artifice to defraud is an essential element of the offenses of both mail and wire fraud, a conviction for mail or wire fraud can support a conviction for a broad scheme regardless of whether the defendant is convicted for each fraudulent act within that scheme.  As such, we look to the scope of the indictment in order to determine whether it details a broad scheme encompassing transactions beyond those alleged in the counts of conviction.

*United States v. Manzer*, 69 F.3d 222, 230 (8th Cir. 1995) (internal citation and quotation marks omitted).  In other words, the VWPA permits courts to order restitution to victims of mail and wire fraud schemes even if those victims are not specifically identified in the counts on which a defendant is convicted.

For example, in *United States v. Henoud*, the defendant was ordered to pay restitution to a local telephone company and four long-distance carriers after being convicted of conspiracy, fraud in connection with his use of an access device, and 12 counts of wire fraud (the same offense to which McPhun pled guilty) related to an overseas call-selling scheme.  81 F.3d at 486 & n.2.  He challenged that restitution order, claiming that it improperly required him to pay

companies that were not named in the indictment, and required him to pay an amount in excess of that alleged in the indictment. *Id*. at 486. The Fourth Circuit affirmed that restitution order, reasoning that the defendant could not be convicted of the charges to which he pled guilty unless it was shown that he had engaged in a scheme to defraud, not just the individual acts of fraud perpetrated on individual companies. *Id*. at 489. It thus concluded that, "the acts comprising the scheme to defraud therefore constitute the conduct underlying the offense of conviction and establish the, 'outer limits of [the] restitution order.'" *Id*. (quoting *Stouffer*, 986 F.2d at 928). The Court also reasoned that the indictment's description of the scheme and the defendant's intended targets were sufficiently broad to include the smaller carriers who were also injured by the scheme. *Id*. Finally, the Court clarified that:

> The VWPA does not state that only those parties named as victims in the indictment may be awarded restitution. To the contrary, the VWPA explains that a party directly harmed by the defendant's criminal conduct in the course of a scheme or conspiracy is a victim for restitutionary purposes.

*Id*.

The Fourth Circuit again addressed this issue in *United States v. Karam*. In that case, the defendant-accountant pled guilty to a single count of wire fraud related to a three-year scheme to defraud two of his clients out of approximately $5.7 million. 201 F.3d at 323-25. He was sentenced to 24 months in prison and ordered to pay restitution in the amount of $774,508. *Id*. at 323-24. The defendant challenged the court's restitution order because it required him to provide restitution for several fraudulent loans that he argued were not directly related to the conduct underlying his specific one-count conviction. *Id*. at 325-26. The Fourth Circuit, however, upheld the restitution order:

> The district court found that the Tyra Loans were part of Karam's "massive scheme" to defraud FAA. Moreover, by pleading guilty [to one count of wire fraud], Karam admitted that he "obtained promissory notes from clients and others by means of false and fraudulent representations and promises, which he

12

used to conceal and perpetuate his criminal conduct." This admission clearly encompasses Karam's use of the Tyra Loans to deceive FAA and FAA physicians for his personal benefit.

*Id*. at 326.

Similarly, in *United States v. Turino*, the defendant pled guilty to one count of mail fraud and one count of wire fraud after being indicted in a 34-count indictment alleging mail fraud, wire fraud, and the interstate transfer of money obtained by fraud. *Id*. at 316. The two charges to which the defendant pled guilty involved fraud perpetrated on a single victim – Sherman Niederecker. *Id*. The district court, however, required the defendant to pay restitution to Niederecker and other victims of his scheme. *Id*. at 316-17. He challenged that order, claiming that he could only be ordered to pay restitution to Niederecker, because Niederecker was the only victim of the crimes to which the defendant had pled guilty. *Id*. at 317. The court of appeals disagreed and affirmed the restitution order because the defendant's plea agreement included admissions that he made misrepresentations to customers other than the one at issue in the counts to which he pled guilty, and that the defendant had acknowledged that he may owe restitution to other victims of his scheme. *Id*. at 319.

In yet another case – *United States v. Manzer* – the defendant was convicted on two counts of mail fraud, two counts of wire fraud, and one count of copyright infringement related to his sale of equipment for use in the unauthorized decryption of premium channel satellite broadcasts. 69 F.3d at 225. The district court ordered him to pay $2.7 million in restitution for losses caused by the sale of an estimated 270 modification or cloning packages. *Id*. at 229. The defendant challenged that order, arguing that the amount of loss should have been limited to the loss engendered by the specific transactions underlying the five counts on which he was convicted. *Id*. at 230. The Court of Appeals affirmed the restitution order, stating that, when reviewing his indictment, it had "no difficulty concluding that [the indictment] details a wide-

ranging scheme and artifice to defraud sufficient to encompass the sale of at least 270 modification or cloning packages." *Id*.

This case is indistinguishable from *Henoud*, *Karam*, *Turino*, and *Manzer*. The Criminal Information against McPhun specifically states that she "devised a scheme and artifice to defraud," and engaged in wire fraud, "for the purpose of executing the scheme and artifice to defraud." [Doc No 6.] In her Plea Agreement [Doc No 8] and supporting Statement of Facts [Doc No 9], McPhun even admits to engaging in wire fraud as part of a scheme in which she "obtained approximately $1 million for D'Andrade and Williams from others." [Doc No 9, ¶ 4.] That scheme is further described in McPhun's Presentencing Report [Doc No 15] as a "scheme to defraud utilizing wire transmissions by Keisha Williams, Christian D'Andrade, and Carla McPhun," which "occurred from October 2014 until February 2018," and resulted in more than $5.4 million in losses to their victims. [Doc No 15, ¶ 21.] As part of that scheme, McPhun "solicited approximately $1 million from friends and business associates," who would "wire or deposit the money into McPhun's Wells Fargo, M&T, or Bank of America account," after which point McPhun "would then wire the money to Williams." [*Id*., ¶ 28.] Movant was one of those "business associates" from whom McPhun solicited $1 million as part of the scheme to which she pled guilty. (*Id.*)

That the single count of wire fraud to which McPhun pled guilty was part of a scheme cannot be disputed. Her Statement of Facts concedes that she, "obtained approximately $1 million for D'Andrade and Williams from others who were willing to loan money." [Doc No. 9 at ¶ 4.] This is an obvious reference to the scheme described in Williams's indictments and the existence of other victims of McPhun's participation in this scheme. Therefore, Movant is a victim and entitled to restitution under the VWPA. *See* 18 U.S.C. § 3663(a)(2).

14

## II.     MOVANT IS ALSO ENTITLED TO RESTITUTION PURSUANT TO THE MVRA AND MCPHUN'S PLEA AGREEMENT.

Movant is also entitled to mandatory restitution pursuant to §§ 3663A(a)(1), 3663A(a)(2), and 3663A(a)(3) of the MVRA.[5]

### A.     Movant Is Entitled To Restitution Under the MVRA as a Victim of McPhun's Criminal Conduct.

Subsection (a)(1) of the MVRA requires the Court to order defendants convicted of certain crimes to "make restitution to the victim of the offense."  18 U.S.C. § 3663A(a)(1). Similar to VWPA, the MVRA defines a "victim" as:

> a person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id.* at § 3663A(a)(2).  This definition is considered synonymous with the same definition of "victim" applicable in the context of the VWPA.  *See*, *e.g.*, *United States v. Dickerson*, 370 F.3d 1330, 1338 (11th Cir. 2004) (because "§§ 3663 and 3663A define 'victim' in precisely the same way," courts "look to cases interpreting either statute"); *United States v. Boyd*, 222 F.3d 47, 51 (2d Cir. 2000).  In *Dickerson*, the defendant pled guilty to 36 counts of wire fraud and one count of Social Security fraud.  *Dickerson*, 370 F.3d at 1332.  The district court, pursuant to the MVRA, ordered the defendant to pay $35,902 in restitution from benefits fraudulently received pursuant to those counts.  *Id*. at 1334.  It also ordered the defendant to pay $6,992 in restitution for benefits that he fraudulently received from Social Security Administration disbursements

---

[5]  18 U.S.C. § 3663A applies because the offense to which McPhun pled guilty, wire fraud, is an "offense against property" under § 3663A(c)(1).  *See*, *e.g.*, *Dickerson*, 370 F.3d at 1335-36. Indeed, McPhun acknowledges in her Plea Agreement that "an offense listed in § 3663A(c)(1) gave rise to this plea agreement . . . ."  [Doc No 8 at 5.]

made outside of the statute of limitations. *Id.* The court of appeals affirmed that restitution order, concluding that, although the statute of limitations prevented prosecution for wire fraud committed to obtain the $6,992, "the district court must, under 18 U.S.C. § 3663A, order the defendant to pay restitution to all victims for the losses they suffered from the defendant's conduct in the course of the scheme," where the crime of conviction includes a scheme as an element. *Id.* at 1342.

McPhun, like the defendant in *Dickerson*, pled guilty to a crime — wire fraud — which includes a scheme as an element. *See, e.g.*, *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012) ("Thus, to convict a person of mail fraud or wire fraud, the government must show that the defendant (1) devised or intended to devise a scheme to defraud . . . ."). All victims of schemes like the one to which McPhun pled guilty are entitled to restitution so long as the harm to the victim is "closely related to the scheme." *Dickerson*, 370 F.3d at 1339 (quoting *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996)). Movant is a victim, and entitled to mandatory restitution, because it was defrauded and harmed by McPhun in furtherance of the ***exact same scheme*** to which McPhun pled guilty. *See, e.g.*, *United States v. Brock-Davis*, 504 F.3d 991, 999 (9th Cir. 2007) (holding that, where the defendant was convicted of several counts related to the manufacture of methamphetamine in a hotel room, the owner of the hotel was a "victim" under the MVRA and "the fact that [the owner] is not mentioned in the indictment is immaterial" to the award of restitution for damage done to the hotel room); *Boyd*, 222 F.3d at 50 (holding that the MVRA mandates restitution for "damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions").

For example, McPhun admitted to fraudulently soliciting approximately $1 million from unwitting investors between February 2017 and February 2018, which she then passed on to

D'Andrade and Williams.  (Ex. 5, Williams 10/16/18 Trial Tr. 459:8-12.)  She further admitted that she told her clients that the money they invested with her would be used for real estate projects, when it was actually sent to D'Andrade and Williams.  (*Id.* at 445:6-446:1, 450:4-24.)  During that same one-year period, McPhun and her associates used the same scheme and artifice to fraudulently solicit $884,000 from Movant that was never paid back.  (*See* Compl., ¶¶ 125-219.)  Accordingly, Movant is a victim of McPhun's scheme under § 3663A(a)(1) and (2), and is entitled to mandatory restitution.

### B.   *Movant Is Entitled To Restitution Pursuant to the Terms of McPhun's Plea Agreement.*

Additionally, pursuant to § 3663A(a)(3), the Court must order "restitution to persons other than the victim of the offense," "if agreed to by the parties in a plea agreement."  *See United States v. Squirrel*, 588 F.3d 207, 212 (4th Cir. 2009) (describing the three categories of persons entitled to mandatory restitution under the MVRA).  Movant falls squarely within the persons entitled to mandatory restitution under § 3663A(a)(3) because McPhun's Plea Agreement specifically provides that restitution be awarded to the victims, like Movant, of any of her conduct related or similar to the conduct described in the charging instrument or statement of facts.  Specifically, McPhun's Plea Agreement states that:

> Pursuant to 18 U.S.C. § 3663A(c)(2), the defendant agrees that an offense listed in § 3663A(c)(1) gave rise to this plea agreement and as such, ***victims of the conduct described in the charging instrument, statement of facts, or any related or similar conduct shall be entitled to restitution***.

[Doc No 8 at 5 (emphasis added).]  This language is clear and unambiguous.  As such, it must be construed according to its plain meaning.  *Heritage Disposal & Storage, LLC v. VSE Corp.*, No. 1:15-CV-1484 (AJT/MSN), 2017 WL 361547, at *6 (E.D. Va. Jan. 24, 2017) ("[W]hen the terms of a contract are clear and unambiguous, a court is required to construe the terms according to the plain meaning."); *accord United States v. Bradley*, 692 F. App'x 118, 121 (4th Cir. 2017)

(stating that "contract-law principles apply to the interpretation and enforcement of plea agreements." (internal citation and quotation marks omitted)).

The language used in McPhun's Plea Agreement to identify those entitled to restitution is not unusual.   In fact, this Court was confronted with similar plea agreement language in *Cunningham v. United States*.   No. 1:14-CR-225 (LMB), 2015 WL 6160722, at *4 (E.D. Va. Oct. 20, 2015).   Cunningham pled guilty to one count of wire fraud.   *Id*. at *1.   His plea agreement did not specify the amount of restitution owed, but, rather, provided that "'victims of the conduct described in the charging instrument, statement of facts or any related or similar conduct shall be entitled to restitution.'"   *Id*. at *4 (quoting the plea agreement).   The Court subsequently ordered Cunningham to pay $1,080,884.54 in restitution to his victims, which included some victims that were only listed in the statement of facts and pre-sentence report, but not enumerated in the plea agreement.   *Id*. at *3-4. (*See also* Ex. 6, Cunningham Plea Agreement; Ex. 7, Cunningham Statement of Facts.)   Unhappy with this decision, the defendant filed a *pro se* Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, claiming that the record in the case did not adequately identify the victims or their losses.   *Id*. at *4.

In denying Cunningham's motion, the Court found that, "[t]he plea agreement contains no provision purporting to limit [Cunningham's] restitution obligation and, on the contrary, the agreement clearly documents the parties' understanding that restitution would be a component of [Cunningham's] sentence."   *Id*. at *3 (quoting *United States v. Cohen*, 459 F.3d 490, 500 (4th Cir. 2006)).   It then proceeded to reject Cunningham's argument that the record did not adequately detail the victims' identifying information and financial losses as "meritless given that, in his Plea Agreement, Cunningham acknowledged that 'victims of the conduct described in

the charging instrument, statement of facts or any related or similar conduct shall be entitled to restitution.'" *Id.* at *4 (citing Cunningham's Plea Agreement ¶ 8).

McPhun's Plea Agreement is indistinguishable from the plea agreement in *Cunningham*. She, like Cunningham, pled guilty to a single count of wire fraud. [Doc No 8 at 1.] Her Plea Agreement also identifies those entitled to restitution using virtually identical language to that used in *Cunningham*, stating that "victims of the conduct described in the charging instrument, statement of facts, or any related or similar conduct shall be entitled to restitution." [*Id.* at 5.] This is a clear example of McPhun "exercise[ing] the option to make restitution to persons other than the victims of the crimes of conviction." *United States v. Peterson*, 268 F.3d 533, 535 (7th Cir. 2001).

The case of *United States v. Peterson* is instructive too. In that case, the defendant's plea agreement promised to pay restitution "for all losses relating to the offense of conviction and all losses covered by the same course of conduct or common scheme or plan as the offense of conviction." *Id.* at 534. The court rejected the defendant's argument that § 3663A(a)(3) should apply "only when the defendant himself specifies both the additional victims and the precise amount of restitution to be paid." *Id.* In doing so, the court explained that § 3663A(a)(3) does not "favor[] full details in the plea agreement" and, even if it did, a defendant could "waive that entitlement and choose a different method." *Id.* at 535. The Seventh Circuit affirmed the lower court's restitution order, holding that § 3663A(a)(3) authorizes a defendant to delegate the power to determine details of restitution, such as who is entitled to restitution, to a judge. *Id.*

Like in *Cunningham* and *Peterson*, McPhun has "'agreed to make restitution to ***all victims of [her] entire course of conduct***, and agreed further that the district judge c[an] make decisions that prove[ ] necessary to implement this choice.'" *Cunningham*, 2015 WL 6160722,

at *4 (quoting *Peterson*, 268 F.3d at 535) (emphasis added).   Therefore, the Court should exercise the power delegated to it and determine that Movant is McPhun's victim pursuant to the terms of the Plea Agreement, and thus entitled to restitution.

### III.   MOVANT IS A VICTIM OF RELATED AND SIMILAR CONDUCT TO THAT WHICH MCPHUN HAS PLED GUILTY.

Between February 2017 and February 2018, McPhun admits to fraudulently soliciting approximately $1 million from unwitting investors that she then passed on to D'Andrade and Williams.   (Ex. 5, 459:8-12.)   She further admits that she told her clients that the money they invested with her would be used for real estate projects, when it was actually sent to D'Andrade and Williams.   (*Id.* at 445:6-446:1, 450:4-24.)   During that same one-year period, McPhun and her associates used the same scheme and artifice to fraudulently solicit $884,000 from Movant that was never paid back.   (*See* Compl., ¶¶ 125-219.)   There can be no question from the admissions made by D'Andrade and McPhun to this Court in Williams's trial that Movant is not only among McPhun's victims of related and similar conduct to that which she pled guilty, but that McPhun's conduct was part of a "single, ongoing scheme to defraud" in which McPhun, D'Andrade, and Williams engaged.   *Dickerson*, 370 F.3d at 1336.

At Williams's trial, D'Andrade testified that – on April 19, 2017 – he texted Williams to tell her that "Carla[ McPhun]'s guy" was wiring $220,000 to Williams's account.   (Ex. 4 at 102:11-15; *see also* Ex. 3, Text No. 120711.)   That is the same day that Movant entered into the Investment 7 agreement with "Carla D. McPhun of the Cadem Capital Group" in the amount of $220,000. (Compl., ¶¶ 129-41 & Ex. 7.)   After the agreement was executed, McPhun – through Robinson – directed Movant to wire that $220,000 to KW&G c/o Williams.   (*Id.*, ¶ 137.)   When Movant refused to do this, McPhun had Movant wire the money to her Wells Fargo account. (*Id.*, ¶ 137-41.)   One week later – on April 26, 2017 – Williams texted D'Andrade to tell him that

she had received this $220,000 "investment." (Ex. 4 at 102:16-21; *see also* Ex. 3, Text No. 122284.)

During McPhun's testimony at Williams's trial, the Government moved into evidence a document titled "Referrals to Celerity by Carla McPhun." (*See* Ex. 8, Schafbuch Decl.) McPhun testified that the document, which listed several names including Matthew McDonald, was a list of people from whom she acquired funds to give to Williams. (Ex. 5 at 455:10-456:1).

The circumstances giving rise to McPhun's guilty plea also mirror those that induced Movant to invest $884,000 in McPhun's scheme in 2017. For example, when McPhun pled guilty to one count of wire fraud on September 17, 2018, she attested to the following facts:

- She "obtained approximately $1 million for D'Andrade and Williams from others who were willing to loan money";

- "Some of those people sent their money directly to Williams, some provided it through [McPhun], and some sent the money to Williams' attorney";

- She "convinced M.W. to provide $100,000";

- She "told M.W. that the money would be used on two real estate projects in Maryland"; and

- She "instructed M.W. to wire her money directly to Williams' account."

[Doc No 9, ¶¶ 4-7.] These factual admissions are virtually identical to those in Movant's Verified Complaint. For example:

- Robinson and McPhun Convinced Movant to "invest" $220,000 in the "D'Andrade Project." (Compl., ¶¶ 125-144.)

- McPhun directed McDonald – through Robinson – to wire that $220,000 investment to Williams. (*Id*., ¶ 137.)

- When McDonald refused to wire the money to Williams directly, McPhun told him that there had been a misunderstanding, that Williams was not involved, and that he could wire the money directly to McPhun. (*Id*., ¶ 139.)

21

- McPhun subsequently solicited an additional $180,000 "investment" from Movant by telling them that she had a real estate endeavor – separate and apart from the D'Andrade Project – that, with an additional investment from McDonald, would enable her to obtain the funds necessary to repay Movant in full.  (*Id.*, ¶ 183.)

- The purported real estate investment that McPhun pitched to Movant was with respect to two Maryland properties that she claimed would serve as collateral for the investment – located on Applegate Court and Northgate Road.  (*Id.*, ¶ 190.)

- McPhun subsequently solicited an additional $160,000 "investment" from Movant that she claimed was secured by those same two Maryland properties.  (*See id.*, ¶¶ 197-211.)

As these and many other facts averred in the Verified Complaint make clear, McPhun defrauded Movant into making fraudulent "investments" with her in the same way, as she admits to duping M.W. to pay her money she allegedly funneled into this scheme.  [*See* Doc No 9.]  They also show that Movant was a victim of McPhun's scheme to obtain money by means of materially false and fraudulent pretenses and representations in order to provide money to Williams, and knowingly using means of wire communications to carry out that scheme.  [Doc No 6.]

That Movant is among McPhun's victims of "related or similar conduct," and of the same scheme to defraud, is further shown by the similarities between the testimony at Williams's trial concerning excuses that she, D'Andrade, and McPhun gave to their victims for needing additional funds, and those offered to Movant to justify non-payment and induce further investments.  For example, one of Williams and D'Andrade's victims testified that Williams told him that one of her investors had cancer, and that she needed more money so they could wrap the deal up before he died.  (Ex. 5 at 284:20-285:6.)  This mirrors what McPhun and Robinson told Movant about one of D'Andrade's other investors dying of cancer.  (Compl., ¶ 182.)  Similarly, D'Andrade testified that Williams extracted additional funds from him and others by telling him that the EU Commission had taken away her passport and were holding her until the penalty tax

on the software they purchased had been paid.  (Ex. 4 at 107:2-109:18.)  This same story was relayed to Movant in order to induce them to loan D'Andrade, McPhun, and their associates an additional $73,000.  (Compl., ¶¶ 169-79.)

In sum Movant is a victim of the same scheme to defraud which resulted in McPhun pleading guilty to wire fraud as to victim M.W.  Thus, Movant is entitled to restitution pursuant to §§ 3663, 3663A, and the terms of the Plea Agreement and should be permitted to recover $884,000 in restitution from McPhun.[6]

## IV.    THE COURT SHOULD NOT DENY RESTITUTION WITHOUT HOLDING AN EVIDENTIARY HEARING.

In criminal cases, the Government typically proves the amount of loss and causation. *United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015).  Yet, if the Government does not undertake this responsibility with respect to a victim, the victim can "prove up its own claim for restitution."  *Id*.  In this case, the Government has represented to Movant's counsel that it does not intend to seek restitution for Movant in this matter.  Under these circumstances, the Court may assign the burden of proof to Movant.  *See* 18 U.S.C. § 3664(e) ("The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.")

The procedure for resolving claims for restitution is provided by statute in § 3664, which states that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the

---

[6]  McPhun's concession to pay restitution beyond the amount due to M.W. was a calculated decision to receive more favorable treatment by the Government.  *See, e.g.*, *Peterson*, 268 F.3d at 534 ("In exchange for promising extra restitution, [defendants] receive[ ] concessions.").  It would be manifestly unjust to allow her to enjoy the benefits of her Plea Agreement without also holding her to the promise of paying additional restitution to all of the victims affected by her criminal conduct.

court by a preponderance of the evidence," and that "the court may require additional documentation or hear testimony" after reviewing the presentence report. 18 U.S.C. § 3664(d)(4), (e). "The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition." 18 U.S.C. § 3664(d)(6). Thus, to the extent that there is any dispute regarding Movant's entitlement to restitution, or about the amount of restitution that should be ordered in favor of Movant, notwithstanding the strong evidentiary showing presented by Movant's Verified Complaint, the documents attached thereto, and additional exhibits presented in support of this Motion, the Court may also order the scheduling of an evidentiary hearing, or, alternatively, refer the matter to a magistrate judge or special master, for proposed findings of fact or recommendations as to disposition of this Motion.

## CONCLUSION

For the reasons set forth herein, Movant respectfully request that this Court enter an Order awarding restitution in favor of Movant McDHoldings, LLC and against McPhun in the amount of $884,000, the total amount of fraudulent investments Movant lost at the hands of McPhun and her co-conspirators, and no less than $530,000, the total amount Movant paid directly to McPhun or her shell company.

Dated:  December 6, 2018                  Respectfully submitted,


                                          */s/ Cathy A. Hinger*
                                          Cathy A. Hinger (VSB No. 46293)
                                          WOMBLE BOND DICKINSON (US) LLP
                                          1200 Nineteenth Street, N.W., Suite 500
                                          Washington, DC  20036
                                          Tel:    (202) 857-4489
                                          Fax:    (202) 261-0029
                                          E-mail:Cathy.Hinger@wbd-us.com

                                          *Counsel for Movant McDHoldings, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 6th day of December, 2018, a copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION FOR ORDER AWARDING RESTITUTION TO VICTIM McDHOLDINGS, LLC**, was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Jonathan Oates
Krum Gergely & Oates, LLC
4103 Chain Bridge Road, Suite 401
Fairfax, VA 22030
E-mail: kverdi@verdiogletree.com

*Attorney for Defendant Carla McPhun*

Grace L. Hill
Jack Hanly
Assistant United States Attorneys
2100 Jamieson Ave.
Alexandria, VA 22314
grace.hill@usdoj.gov
jack.hanly@usdoj.gov

*Attorneys for the United States*

/s/ Cathy A. Hinger
Cathy A. Hinger